UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

RASHEEN MILLS,

                    Petitioner,

            v.

SUPERINTENDENT ROY A. GIRDICH,
Upstate Correctional Facility,

                    Respondent.

**REPORT AND RECOMMENDATION
No. 03-CV-0341(RJA)(VEB)**

## I.     Introduction

*Pro se* petitioner Rasheen Mills ("Mills") seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the basis that his conviction on charges of second degree (depraved indifference) murder and criminal possession of a weapon was unconstitutionally obtained. This matter was referred to the undersigned for the purposes of hearing and deciding non-dispositive motions, and issuing a report and recommendation regarding the disposition of Mills' petition. (Docket No. 14).

## II.     Factual Background and State Court Procedural History

On July 22, 1999, sixteen-year-old Nola Okorougo ("Okorougo" or "Nola") was fatally shot once in the back while she was in front of her house at 295 Auburn Avenue in the City of Buffalo. The bullet lodged in Okorougo's body was from a .380-caliber semiautomatic gun, but the weapon was never recovered. Several eyewitnesses, including Okorougo's boyfriend, Edward Jaycox ("Jaycox" or "EJ"), identified Mills as the shooter. Ten days after the shooting, Mills turned himself in to the police. Mills was subsequently indicted by an Erie County Grand Jury on two charges of second degree murder–depraved indifference (N.Y. Penal Law §

125.25(2)), and intentional (N.Y. Penal Law § 125.25(1)). He was also indicted on one charge of

second degree criminal possession of a weapon (N.Y. Penal Law § 265.03(2)). The trial court

denied the defense's motion to suppress certain items seized from a consensual search of Mills'

mother's house, as well as a line-up identification of him by Cheryl Fabbiano ("Fabbiano"), one

of the decedent's neighbors.  Mills' jury trial was conducted in Erie County Court (Amico, J.), in

January 2000. The theory of the defense was that Mills acted in self-defense and was afraid that

the decedent and/or Jaycox, with whom he had had a physical altercation two days prior to the

shooting, were about to use deadly physical force against him.

> **A.     The Prosecution's Case**

Jaycox, nineteen years-old at the time of trial, had known Mills from school for about

two years before the shooting. T.67. They got along at first, but "after awhile [they] fell apart,"

meaning they were not speaking any more. T.68. Jaycox stated that the only actual fight he

recalled with Mills occurred on July 20th, two days before the incident. T.68. Kerry Eldridge

("Eldridge"), one of Mills' friends, said that Mills and Jaycox had fought "a few times in Jasper

Parish projects," and there was a fight at the Regal Cinema, but Eldridge had not seen that one.

T.218.

At the July 20th  fight, which broke out when Mills and Jaycox got off the bus coming

home from summer school, Mills hit Jaycox with a stick at the corner of Delevan and Grant

streets. T.68-69. Okorougo was also was present at the fight. T.70.

According to Jaycox, the fight started from a confrontation they had a couple weeks

before when Mills "had said some words to" Jaycox when they were walking towards

Okorougo's house at 295 Auburn Avenue. T.71. Robin Bell ("Bell"), one of Okorougo's friends,

also witnessed the July 20th fight starting while she and Okorougo were still on the bus. T.184. Jaycox was chasing after Mills, who dropped his pager on the ground. T.184. Kerry Eldridge, one of Mills' friends, said that as Jaycox was chasing after Mills, Mills "turned around and jabbed him right in the face." T.217.

Nevertheless, Jaycox testified that he threw the first punch on July 20th, hitting Mills in the face. T.71. Mills "then gets on the phone and starts calling people and starts running towards Grant Street and Delevan." T.71.  "[T]hen a car pulls up and his brother and some older guy gets out of the car." T.72. Mills "exchanged words with them, and then the older guy told him to handle his business, and that's when they tried to jump [Jaycox]." T.72. Mills and his brother Elliott jumped Jaycox and they got into a fight right there on the corner. T.72.

Jaycox said he was hit a "[c]ouple times" during the fight. T.73. At one point, Jaycox said, "I was grabbed by Rasheen from the back side and he was telling his brother to hit me, but when his brother went to punch me, I moved out of the way and his punch went past my face." During the fight, Okorougo was trying to get Mills off of Jaycox, and "was punching him in the face too." T.73.  Bell said that Okorougo was wearing rings, and when she hit Mills in the face, his eye was bleeding. T.182. She had a "big ring," big enough to hurt somebody with. T.187. Bell also said that Mills was holding Jaycox at one point, telling the other guy to hit him. T.182. Bell started kicking Mills and telling him to let go. T.182. Eldridge testified that Mills had a "big stick" "like a 12-foot stick, like a four-by-four" piece of lumber. T.246.

Mills then let Jaycox go, and Jaycox punched Elliott in the face, "and that was the end of it." T.73. Jaycox testifed that he and Okorougo left.

Two days later, on July 22nd, at about 7:15 p.m., Jaycox and Okorougo were walking

down her driveway at 295 Auburn so that Jaycox could smoke a cigarette. T.75, 76. As he was

having his cigarette, Jaycox noticed Mills on a silver "trick bike" coming up Auburn Avenue

from Parkdale towards Grant Street. T.76-78.  Mills was with a "small, dark-skinned female"

with a "glass eye" wearing a "gray dress." T.77. Upon seeing Mills, Okorougo walked further

down the driveway, and Mills said, "there go that bitch ass Nigger, and goes in his right pocket

and pulls out a gun." T.78. It was a "small black handgun," an automatic. T.79. Jaycox claimed

that he did not hear Okorougo say anything to Mills. However, on cross-examination, Jaycox did

admit that Okorougo "was going to confront him about what [Mills] said on the 20th, that he was

going to get his sister or somebody to beat her up." T.123.  Upon being questioned as to whether

Okorougo had said anything to him about that, Jaycox said no and that he did not know why

Okorougo was walking out to the street. T.124.

When Mills yelled out, Okorougo was "past the sidewalk, going almost into the street in

the driveway area." T.78. Mills was diagonally across the street from them, on the sidewalk.

T.80.

Jaycox said that when Okorougo saw the gun, she started to run back up the driveway.

Mills fired the first shot "[m]ore angled towards the ground" as if "he was fidgeting with it[.]"

T.81. After that, "that's when he started just shooting it." T.81. After the "first shot rang off" was

when Jaycox started running. T.81. As he was running, Jaycox heard four to five shots coming

from behind him. T.82.

When they got to the porch, Jaycox asked Okorougo if she was hit, and she said yes.

T.82. Jaycox took of his t-shirt and wrapped it into a knot, and was holding it against her gunshot

wound (on her upper right shoulder, more on her back). T.83. Okorougo did not speak anymore

-4-

and did not regain consciousness. By the time the police arrived, Okorougo did not have a pulse. T.139.

Because a crowd was gathering and Jaycox was getting more upset, the officers put him in the back of the patrol car. Before doing so, they did a routine pat-down of Jaycox down when they arrived, and found no weapon. Jaycox testified that he never possessed a handgun before or during the shooting, and never threatened Mills with a handgun at any time. T.75. Neither did Okorougo. T.76.

During their investigation of the scene, the police found five shell casings in the street on Auburn Avenue and on the sidewalk in front of Okorougo's house. T.144, 284, 307. The casings came from a 380 caliber semiautomatic weapon. T.284, 286. However, the weapon used was never recovered. T.144. By the time they arrived, the shooter had left the scene. T.176. The police recovered from Mills' residence at 91 Parkdale certain items that the shooter was described as wearing at the time of the shooting, a blue and silver football jersey with the number 89 in black.  T.312. The police also found the "trick bike" described by Jaycox, a 20-inch "dyno" bike which was lime-green, On August 1 about 10 days after the shooting, Mills turned himself in to the police. T.474-76.

Two friends of Mills', Kristina Kessel ("Kessel") and Kerry Eldridge ("Eldridge"), testified that on July 21st, Mills had come up to them while they were sitting on their porch. Mills was saying "that EJ and them, they just tried to jump him again and made him break his new CD player and drop it on the ground, and then he showed us a gun and said he was going to get that bitch." T.190. By "that bitch," Kessel and Eldridge understood Mills to meann Okorougo "[b]ecause she had cut his face the day before" during the fight between Mills and Jaycox.

T.191, 213. Kessel had not witnessed the fight but had heard about it from Mills. Eldridge was

present at the fight and said that Mills had to get stitches where Okorougo punched him. T.215.

Eldridge really did not know Jaycox well. T.216.

According to Kessel, the gun Mills displayed was "small, black"; she "didn't get an

actual look at it" because he "just pulled it real fast" from his pants. T.191, 195. Eldridge said

that it was an 380 automatic. T.212. Eldridge had seen Mills with the gun the week before at his

house on Parkdale; Mills had it out and was cleaning it. T.213.

Kessel's mother, who was also present said, "Rasheen, give me the gun. Take the clip

out. Give me the gun and go home for a couple days and let it cool down." T.192. Kessel told

him to "just . . . get some bitches to jump her, or just get somebody to fight her rather than going

do [sic] jail." T.192. Mills "didn't say nothing [sic]." T.192. He rode away on his bike, which

was "like a Dina stunt bike . . . ." T.192, 214.

Eldridge testified that he had known Mills for about five to seven years. On the night of

July 22nd, Eldridge was on his way to the Wilson Farms convenience store located on Auburn

and Grant. "All of a sudden [he] heard pow, pow, pow, came outside, ran around the corner and

looked and seen [sic] Rasheen leaving the scene going up Auburn towards Parkdale," where

Mills resided at the time. T.201, 203. Mills indicated that he heard five shots fired. Mills was on

a "green Dina back, 20-inch bike." T.202. After hearing the "pow, pow, pow", Eldridge "got

panicked, like [he] was in shock" and just stayed there until after the police officers came and

went. T.203. Although he only saw the person's back, Eldridge was certain the person on the

bike was Mills. T.235.

Eldridge spoke with two police officers, and told them that he heard five shots and saw

-6-

Rasheen leaving towards Parkdale. T.205. Eldridge also told the police that he believed Mills got the gun from "Carlton" who lived at 38 Perkins Street. Mills used to hang out there. However, Mills was not there after the shooting. T.206, 208. Eldridge admitted that when he signed his statement, he used the name of his older brother, Tyshawn Johnson, because he was "in shock . . . and . . . seeing one of [his] friends do something like that is bad, period." T.209. Eldridge testified that he had never had any problems with Mills.

Emily Rivera ("Rivera") lived a couple of houses down from Mills and had known him for about two years before the incident. T.260-61. At about 7:20 on July 22nd, she was riding her bike down Parkdale towards the store. As she turned onto Auburn, she hard "[a]bout five, four or five" shots and saw "a girl running out the driveway screaming." T.262. Rivera saw Mills "coming out the drive[way], riding on his bike." T.262, 263. The girl had a dress on, "like a green flowered dress," and "was just screamiing, oh, my God, what did you do? What did you do, Rasheen?" T.262-63. Rivera saw Mills drop "something black" on the ground, but she could not see what it was, although she "thought it was the gun." T.263-64. Mills rode past Rivera but did not say anything to her, and she did not see where he went. T.264. Rivera kept going and turned into the driveway where the girl had been shot. T.265. Rivera saw Okorougo's stepfather holding her, and Jaycox was looking for the phone. When the ambulance and police arrived, Rivera left and rode her bike home. T.265. She gave a statement to the police later that night. T.266.

Sara Lugo ("Lugo"), who did not know any of the parties involved, testified that she was visiting friend at 295 Auburn on the night of July 22nd. They lived in the front house; Okorougo lived in a cottage set farther back on the property. T.249. Lugo recalled that she was watching

the Yankees game in the front room of the house, which had a large window with a view of the

street. T.249-50. She heard a "bam, bam, bam," which sounded "like a gunshot." T.250. When

she looked outside, she saw Okorougo running up the driveway. There was a "skinny, tall guy,

black guy behind her with a gun." T.251. He was "[s]tationary" in the street. T.251. She had

never seen him before and did not remember what he was wearing. T.252. When she went to the

window, the guy was still shooting. T.253. After the shooting stopped, Lugo called 911.

There was another eyewitness from the Auburn Street neighborhood, Cheryl Fabbiano

("Fabbiano"). Fabbiano lived on Auburn near Parkdale in July of 1999 with her two daughter

and her boyfriend. T.414. Her house was on the same side of the street as Okorougo's. At about

7:20 p.m., Fabbiano was sitting on her couch when she heard five or six gunshots. T.416. She

went to the door and opened it and saw a black female and a black male; the female was wearing

a grayish-blue dress and running on foot and the male was on a bike. The male had braids in his

hair and was wearing a black shirt with white numbering. T.417. Fabbiano heard the girl in the

dress say, "I fucking can't believe you did that." T.418.  That sort of made Fabbiano nervous.

Fabbiano had seen the male before around in the neighborhood. T.419. Fabbiano identified Mills

as the shooter twice during a line-up procedure. T.373-74.

Anthony D. Stefano ("Stefano") was the last eyewitness. He was walking west on

Auburn Avenue on the way to the corner store at about 7:15 p.m. on July 22nd. T.427. He was

familiar with the area, having grown up there. Also, the girl he was dating lived there. T.427.

Stefano recalled that he noticed, across the street from him, a guy and a girl; the guy was

walking a bike, straddling it, and the girl was walking along with him. T.430. The guy was

between five-eleven and six-feet, with braided hair and a dark football jersey with white

numbering on it. T.430. The girl was wearing a dress. T.430. They were on the opposite side of the street from Stefano, about even with him. T.431.

Stefano said that he saw *two* young black females in front of 295 Auburn. Stefano was the only witness who testified that he did not see a young male in jean shorts and a white T-shirt (i.e., Jaycox) at the end of the driveway with Okorougo. Rather, according to Stefano, he saw Jaycox in the backyard of 295 Auburn, after the shots were fired. T.435.

Stefano recalled that one of the young women in front of 295 Auburn began "exchanging fighting words" with the girl in the dress. T.431. They were "saying you bitch this, and, you know, to that effect as if they were ready to fight." T.431. The girls approached each other and just as they were about to meet in the middle of the street, "the guy on the bike threw his bike down and pulled out a pistol, and that startled the girl in the street and her friend . . . and they began to run up the driveway of 295 Auburn." T.432. According to Stefano, the guy with the gun said, "you fucking bitches, don't pull that shit around here, or something like that." T.433.

Stefano stopped walking as soon as he saw the pistol come out. T.434. Stefano heard "[a]bout six" gunshots, fired as the guy "was kind of stepping rapidly towards the middle of the street and towards the driveway that they were running up . . . ." T.435. The shots were fired one right after another. T.435. Stefano testified that the shooter had his arm "extended and pointed" "in the direction of the people running." T.453. When the first shot was fired, the gunman was "10, 15 yards at the most" away from the closest girl (i.e., Okorougo), whose back was to him.

After the guy stopped shooting, he and the girl in the dress "fled the opposite way back down Auburn." T.436. Stefano heard the girl in the dress say, "what did you  do that for? Are you crazy, or something . . . ." T.436-37.      Stefano went to the corner store and told the clerk

to call 911 because somebody had been shot.

The county medical examiner testified, *see* T.479-86, that during the autopsy he found one bullet hole located on the right-side of the victim's back in the shoulder area. T.481. The bullet had penetrated the right lung and ended up in the right clavicle. The bullet was large in caliber, jacketed, and slightly deformed. T.484. There was a large amount of blood in the chest cavity. The victim died of a gunshot wound through the back, which caused damage to the lung, which in turn caused loss of blood, internal bleeding, and pneumothorax (air leaking into the chest cavity). T.484.

### B.    The Defense Case

Prior to the defense case, trial counsel moved to dismiss the case. This was denied by the trial judge.

The first witness for the defense was Gabrian Turner ("Turner"). T.485.   Turner said that she and Mills were walking to the store and talking to each other.  They were not talking about Okorougo or Jaycox.  T.488-89.  According to Turner, when they approached the driveway at 295 Auburn, Okorougo  walked out, kicked off her shoes and said, what's up mother Fucker? T.489.  Turner testified that she had no problems with either Jaycox or Okorougo.  At the same time that Okorougo spoke, Jaycox "was lifting up his shirt and like moving back."  T.490. Turner stated that Jaycox was still facing the street and was walking backwards.  When asked what she saw when Jaycox lifted up his shirt, Turner said, "I seen, well, I thought I seen a gun." T.490.  Mills then "got off his bike and pulled out his gun, and after he pulled out his gun, I turned and I ran." T.490.  Turner admitted that she did not see the shooting.  Turner had known Mills for about a month before the shooting; they were dating.  Mills had told her that when

Okorougo punched him in the eye, one of his contact lenses ripped. T.491.  He stopped wearing his contact lenses after that because it was "no good to wear one."

Turner testified that she gave a statement to the police three days after the shooting on July 25, 1999.  T.487. That was the first time she had spoken to the police. In that statement, she mentioned that Jaycox had a gun. However, Turner testified differently at the grand jury, saying that she did not know what she saw. Turner claimed, "it was so many people pressuring me, telling me that it couldn't have been a gun because how it happened, so I was so scared, I don't know because they were threatening me about going to jail and stuff about what happened." T.493-94.  Turner admitted that at the grand jury she did not tell them that she saw a gun but she told them, "I seen something" T.494.  She did tell them that she saw Jaycox pulling up his shirt. She testified that she was threatened that she could go to jail if she insisted that Jaycox had a gun on him. T.495.

On cross-examination, Turner admitted that her relationship with Mills ended in the summer of 1999, after they had an argument.  She admitted that the police came to her house during that argument because Mills pushed her into a couch. T.499.  Mills also damaged a radio belonging to her.  She filed charges against him as a result of that incident, but did not proceed with the charges. T.501.

When shown a photograph of Jaycox, Turner stated that she did not recognize who it was. T.501.  Turner admitted that she has damage to her left eye (glaucoma), but stated that her vision in her right eye was fine. T.502.

Turner testified on cross-examination that while she and Mills were walking up the street, Mills asked  her if she had been "talking to a certain boy," and she said no.  Turner denied,

however, that she and Mills were arguing.  T.504.  Turner admitted that she referred to him as

being "hyper" that night.  T.505.  Turner testified that she was wearing a blue dress with flowers

on it and that Mills had braids in his hair, no glasses, a football jersey, jean shorts, and was

riding a "dyno bike." T.506.

Turner admitted that when the decedent called out, "what's up mother fucker," the

decedent did not have anything in her hands.  T.508.  Turner recalled that the other person (i.e.,

Jaycox) was "like in the middle of the driveway" and was not anywhere near the decedent.

T.509.  Turner admitted that the person whom she claimed to have seen with a gun under his

shirt did not pull out the gun, threaten anyone with the gun, or aim or fire the gun. T.510.

When confronted with her grand jury testimony, Turner admitted that she had told the

grand jury that, she "didn't know" what it was that she saw, and that the "something" and

"could've been a belt buckle." T.511-12.  The prosecutor confronted Turner with her grand jury

testimony in which she said, "I saw EJ shirt go up.  It could have been a belt buckle I saw.  I

never saw EJ with a gun.  I think EJ had on a white T-shirt.  I'm not sure what I saw."  T.516

Turner claimed at trial, "I don't remember testifying that way and stated, you questioned me so

many times, telling me so many different stuffs."   However, Turner would not deny that she said

what she had said at the grand jury.  T.517.  Turner had also told the grand jury that she and

Mills had broken-up at the time of the shooting because the father of Turner's baby was coming

home from jail.  T.517.  Turner claimed that she did not remember whether she said, "I can't

fucking believe you did that," after Mills had fired. T.519

Turner admitted that she spoke to Mills on the phone after the shooting; he called her

later that night and told her that she should get out of her house.  She agreed that she did not

-12-

stick around on July 22 to talk to any of the police investigators who were on her street.  T.522.

She admitted that she went away to Erie, Pennsylvania for three days but claimed that she had

plans to go there before the shooting.

Turner said that Mills pulled out a small black handgun but she could not remember

whether it was in his right or left hand.  At that moment, Okorougo turned away from him, and

Turner also turned away from him.  T.512-13.  Turner ran and said, "what the fuck is [sic] you

doing?"  T.513.  Turner did not see Mills fire the first shot.  She did not see him aiming toward

Okorougo.  T.514 Turner admitted that she heard more than two shots.

Turner admitted Mills had told her about the fight on July 20th in which Okorougo  had

punched him in the eye with her ring, and that he referred to her as the "bitch that hit him in the

eye with the ring."  T.524. Turner admitted that she had visited Mills at the holding center and

that she had received phone calls and received letters from him. T.525. In fact, Turner had talked

on the phone with Mills recently. Turner admitted that the phone call was toward the end of 1999

a little before 2000, i.e., just before Mills' jury trial was set to begin.  T.534. After this

conversation, Turner testified, she had become fearful that "someone was getting out of jail" and

was going to kill her for turning "state's evidence" against Mills. T.526. Turner apparently

received a death threat from someone whom she did not identify. This "someone" was never

identified by Turner, and Turner claimed that it was not Mills.

On re-direct examination, Turner insisted that she did not feel threatened by Mills.

T.527.  With regard to the alleged threat by the police that she would be prosecuted for perjury if

she kept her story of July 25th, in which she had mentioned that Jaycox had a gun, Turner said,

"They told me if I keep saying that EJ had a gun that I could do 1 to7 [years in prison]."  T.530.

On re-cross examination, Turner was questioned further about whether or not Jaycox had a gun in his waistband. Turner was evasive.  She ultimately said, "I don't know." T.531.  Turner agreed that what she saw could have been about belt buckle.  T.532.

The prosecutor then questioned Turner about her conversation with Mills and "turning state's evidence," as she put it.  The prosecutor asked her if she remembered coming to his office with her mother, who had asked the prosecutor to protect Turner. T.533. Turner continued to maintain that it was not Mills who was issuing the threat and attempted to deny ever mentioning that the death threat was because of her "turning state's evidence." Turner said that maybe her mother mentioned the threat, but she had not.  T.533.

The second witness for the defense was Edmund Bliss ("Bliss"), who testified that he had known Mills for about 15 years that he had been in a relationship with Mills mother, and that he considered Mills to be his stepson. T.535.  Bliss testified that he kept in touch with Mills.

In July of 1998, the year before the incident, Bliss and Mills were sitting outside on their steps. Bliss recalled that a group of fellows came out of a car and approached the house. Bliss said that "they wanted to fight."  T.538.  At first Bliss told Mills that he should not fight, but the other boys "insisted on fighting, so they fought head up."  On direct Bliss said that the other pugilist "possibly" was Jaycox. T.539.  On cross, however, Bliss readily admitted that it was not Jaycox. According to Bliss, the four boys in the car wanted to jump on him, but because Bliss was there, they decided to fight one-on-one.  T.540. Bliss did not know these four individuals, but the one who fought Mills was a person he identified only as "the guy."  Because he was bigger, "the guy" got the best of Mills.  At the time, Bliss thought that they had resolved any differences by fighting one-on-one and that it would clear up from that point on.  After it had

broken up, Bliss was helping Mills to the house, Bliss looked over to the side and noticed that "the guy" had a gun in the car.  Bliss said, "he held the gun up, you know, showing what this could have been, what could have occurred, I guess if I would have jumped into it."  T.541. Bliss admitted that the person who held up the gun was not Jaycox. T.546.

Bliss also testified that in April of 1999, he was on the way to the store with Mills and a friend of his, and when he came back out of the store he found that Mills had been hit and his nose was "bleeding and broke" and "the guy was fleeing the scene and running down the street." T.  542.  Bliss did not know who that guy was and could not give a full description of him.  Bliss testified that he took Mills to the hospital, where the medical providers stated that it appeared that Mills nose was broken by being struck by an object.  T.  543

During the summer of 1999, Bliss became aware of that Mills was having some problems with "about three fellows who jumped on him on the east side of Buffalo."  T.537. On July 20, 1999, Mills was brought over to Bliss's house by one of Bliss's friends. It appeared to Bliss that Mills had a cut over his eye and that Mills was afraid.  T.545.

Bliss stated that in July of 1999 he was not aware that Mills had a .380-caliber semiautomatic handgun and ammunition for that gun.  T.548.

### C.     The Parties' Requests to Charge and the Jury's Verdict

At the close of the proofs, the prosecutor asked for a jury instruction on transferred intent, arguing that Mills could have been aiming for Jaycox but Okorougo (the victim) happened to get in the way of fire.  The trial judge granted that request.  T.551-52.

Trial counsel asked the court to consider charging extreme emotional disturbance on the first count and justification on the second count. The trial judge stated that he saw no evidence of

mental disturbance, but there was some proof of conduct by Mills that might go to a justification

defense. T.552. The trial court accordingly agreed to charge justification. However, the trial

judge refused to charge a lesser included offenses of manslaughter in the second degree or

criminally negligent homicide stating that there was "no reasonable view of the evidence that

would warrant a charge of reckless or negligent conduct and with respect to the justification, it's

a slim call as it is, [defense counsel]." T.554.

The jury rejected the justification defense and returned a verdict convicting Mills of

second degree depraved indifference murder and second degree criminal possession of a weapon,

and was acquitted of intentional murder. Mills was thereafter sentenced to concurrent terms of

imprisonment, the longest of which was twenty-five years to life on the second degree murder

conviction.

### D.      Post-Conviction Proceedings in State Court

Represented by new counsel, Mills appealed his conviction to the Appellate Division,

Fourth Department, of New York State Supreme Court. The judgment of conviction was

unanimously affirmed. Leave to appeal to the New York Court of Appeals was denied.

Mills subsequently challenged the effectiveness of appellate counsel's assistance in an

application for a writ of error *coram nobis* filed with the Appellate Division. This was summarily

denied. At first blush, it appeared that Mills did not seek leave to appeal to the New York Court

of Appeals. However, Mills ultimately produced evidence that he had, in fact, appealed to that

court.

### E.      The Habeas Petition

Mills federal habeas petition raised five grounds for relief: (1) the Grand Jury should

have been instructed concerning the defense of justification (self-defense); (2) the trial court

erroneously declined to charge the jury on criminally negligent homicide and manslaughter; (3)

the trial court erroneously instructed the jury regarding the defense of justification; (4) the trial

court's *Allen* charge was erroneously given; and (5) appellate counsel was ineffective because

she failed (a) to challenge the sufficiency and weight of the evidence supporting his convictions

and (b) to challenge trial counsel's failure to have objected to the trial court's supplemental

instruction regarding the justification defense and *Allen* charge.

Respondent answered the petition, asserting that ground four (erroneous *Allen* charge) is

unexhausted.[1] Respondent states that although ground four was raised before the Appellate

Division on direct appeal, it was not raised in the application seeking leave to appeal to the New

York Court of Appeals. Within the Second Circuit, a petitioner has exhausted his state remedies

when he has "(i) presented the federal constitutional claim asserted in the petition to the highest

state court (after preserving it as required by state law in lower courts) and (ii) informed that

court (and lower courts) about both the factual and legal bases for the federal claim." *Ramirez v.*

*Attorney Gen'l of New York*, 280 F.3d 87, 94 (2d Cir. 2001). Mills claims that he did fulfill the

exhaustion requirement by arguing in his *coram nobis* application that appellate counsel had

---

[1]     "An application for a writ of habeas corpus on behalf of a person in custody pursuant to a
judgment of a State court shall not be granted unless it appears that–(A) the applicant has exhausted the remedies
available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A); *see, also, e.g., O'Sullivan v. Boerckel*, 526 U.S.
838, 843-44 (1999); *accord, e.g., Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir.1994), *cert. denied*, 514 U.S. 1054,
(1995)."The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state
courts." *Daye v. Attorney General*, 696 F.2d 186, 191 (2d Cir.1982) (*en banc*), *cert. denied*, 464 U.S. 1048  (1984).
This means that the petitioner must have alerted the state appellate court that a federal constitutional claim is at
issue. *E.g., Grady v. LeFevre*, 846 F.2d 862, 864 (2d Cir. 1988). To exhaust a claim under 28 U.S.C. § 2254(b), the
petitioner must "(i) present[ ] the federal constitutional claim asserted in the petition to the highest state court (after
preserving it as required by state law in lower courts) and (ii) inform[ ] that court (and lower courts) about both the
factual and legal bases for the federal claim." *Ramirez v. Attorney General*, No. 99-2047, 2001 WL 1028326 at * 5
(2d Cir. September 7, 2001) (citing *Picard v. Connor*, 404 U.S. 270, 276-77 (1971); *Daye*, 696 F.2d at 191-92).

been  ineffective for failing to argue that trial counsel erred in not objecting to the *Allen* charge.
(Docket No. 22).

Respondent also contends that ground four is procedurally defaulted because the
Appellate Division relied upon an adequate and independent state ground in order to deny it.
"[F]ederal habeas review is foreclosed when a state court has expressly relied on a procedural
default as an independent and adequate state ground, even where the state court has also ruled in
the alternative on the merits of the federal claim." *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d
Cir.1990); *accord Harris v. Reed*, 489 U.S. at 264 n. 10 (stating that "as long as the state court
explicitly invokes a state procedural bar rule as a separate basis for decision," the adequate and
independent doctrine "curtails reconsideration of the federal issue on federal habeas"). In order
to overcome a finding of procedural default under this rule, a habeas petitioner must show cause
for the default and prejudice resulting therefrom, or that a "fundamental miscarriage of justice"
will occur should the habeas court decline to hear his federal claim. *Harris v. Reed*, 489 U.S. at
262.

As discussed further below in this Report and Recommendation, I agree with respondent
that ground four (erroneous issuance of an *Allen* charge) is subject to an unexcused procedural
default, and further habeas review of it is precluded.

Respondent also asserts that ground five (ineffective assistance of appellate counsel) is
unexhausted because Mills failed to appeal the denial of his *coram nobis* application, in which he
raised the ineffective assistance of appellate counsel claims, to the New York Court of Appeals.
Respondent states that the petition is a "mixed" petition because it contains both exhausted and
unexhausted claims. *See Rose v. Lundy*, 455 U.S. 509 (1982); *see also Zarvela v. Artuz*, 254 F.3d

374, 377 (2d Cir.), *cert. denied sub. nom. Fischer v. Zarvela*, 534 U.S. 1015 (2001).[2] In response,

Mills has submitted a copy of the order from the New York Court of Appeals denying leave to

appeal the denial of his *coram nobis* petition. (Docket No. 22). Therefore, it does appear that

Mills' ground five (ineffective assistance of appellate counsel) has been properly exhausted.

### F.      The Motion to Stay and Motion to Amend

Some time after respondent answered the petition, Mills submitted a letter requesting a

"brief state [sic] of abeyance until the exhaustion of my 440.10 motion or untill [sic] the trial

court grants further relief . . . ." *See* Docket Nos. 15 & 17. This Court denied Mills' motion to

hold the petition in abeyance without prejudice to re-filing upon a showing that petitioner is

entitled to a stay of the petition pursuant to *Rhines v. Weber*, 544 U.S. 266, 277 (2005). (Docket

No. 18). Specifically, the Court directed Mills, when re-filing his stay motion, to identify the

unexhausted claim or claims, and to show that "(1) there is 'good cause' for petitioner's failure

to exhaust the new claims; (2) that the new claim relates back under FED. R. CIV. P. 15 and

*Mayle v. Felix*, 545 U.S. at 650,[3] to the claims originally pled in the Petition; and (3) that the new

claim is potentially meritorious."  (Docket No. 18).

Mills has now filed a renewed motion to stay, along with a motion to amend and a

proposed amended petition. (Docket No. 19).  In Mills' renewed motion to stay and motion to

---

[2]      The Second Circuit held in *Zarvela* that "a district judge confronting a mixed petition has discretion either to dismiss the petition, or to dismiss only the unexhausted claims and stay the balance of the petition." However, in *Rhines v. Weber*, 544 U.S. 269 (2005), the Supreme Court limited the district courts' approval of the stay-and-abeyance procedure (such as that described in *Zarvela v. Artuz*) to those situations where there is *both* a showing by petitioner of "good cause" for the petitioner's failure to exhaust the claims in state court prior to bringing the federal habeas corpus petition *and* that the unexhausted claims are not "plainly meritless." *Id.* at 277.

[3]      "An amended habeas petition . . . does not relate back (and thereby escape [28 U.S.C. § 2244(d)(1)]'s one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle*, 545 U.S. at 650.

amend, he mentions three *new* claims that he wishes to exhaust by means of a C.P.L. § 440.10

motion: "(1) ineffective assistance of trial counsel, (2) Insufficiency of evidence, (3) Due

process." Respondent has submitted an affidavit opposing the stay and the amendment of the

petition. (Docket No. 21). Mills filed a reply affidavit. (Docket No. 22).

   Mills' motion to amend his habeas petition is governed by Federal Rule of Civil

Procedure 15(a). *Littlejohn v. Artuz*, 271 F.3d 360, 363 (2d Cir.2001); *see also Fama v.*

*Commissioner of Corr. Srvs.*, 235 F.3d 804, 815 (2d Cir.2000). Where, as here, a responsive

pleading has been served, leave to amend is required. Fed. R. Civ. P. 15(a). Although leave to

amend shall be "freely given," Fed. R. Civ. P. 15(a), "district courts nonetheless retain the

discretion to deny that leave in order to thwart tactics that are dilatory, unfairly prejudicial or

otherwise abusive." *Littlejohn*, 271 F.3d at 363 (citing *Forman v. Davis*, 371 U.S. 178, 182

(1962) (listing "undue delay, bad faith or dilatory motive on the part of the movant, repeated

failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing

party by virtue of allowance of the amendment, futility of amendment" as valid reasons for

denying leave to amend)); *accord, e.g.*, *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d

Cir.1995); *Weeks v. New York State Div. of Parole*, 273 F.3d 76, 88 (2d Cir. 2001); *Marchi v.*

*Board of Coop. Educ. Servs. of Albany*, 173 F.3d 469, 477-78 (2d Cir.1999) ( "Although leave to

amend is usually freely granted, it may be denied within the trial court's discretion where the

proposed amendment would be futile." ) (citation omitted). A proposed amendment is futile "if

the proposed claim could not withstand a motion to dismiss for failure to state a claim upon

which relief may be granted." *Lucente v. International Business Machines Corp.*, 310 F.3d 243,

258 (2d Cir. 2002) (citing *Dougherty v. North Hempstead Bd. of Zoning Appeals*, 282 F.3d 83,

88 (2d Cir. 2002)); *see also Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990)

(stating that here there is no merit to a proposed amendment, leave to amend should be denied).

To the extent that Mills' proposed three claims were raised for the first time in his

recently filed C.P.L. § 440.10 motion to vacate the judgment, they appear to be procedurally

defaulted. This is because the County Court relied exclusively upon a state procedural rule,

C.P.L. § 440.10(2)(c), to deny the claims. The United States Supreme Court has held that

reliance by a state court upon an adequate and independent state ground to decided a

constitutional claim precludes federal habeas review of that claim unless the petitioner can show

cause for the default and prejudice attributable thereto, or that the petitioner is factually innocent

such that a fundamental miscarriage of justice would occur should the federal court decline to

hear the claim. *E.g., Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991); *Harris v. Reed*, 489

U.S. 255, 262 (1989); *accord, e.g.*, *Fama v. Commissioner of Corr. Servs.*, 235 F.3d 804, 809

(2d Cir. 2000). I note that Section 440.10(2)(c)of the C.P.L. has been held by the Second Circuit

to be an "adequate and independent" state ground. Neither cause nor prejudice is apparent on the

record before me, and Mills has not made any attempt to establish factual innocence. Because

proposed amended claims would be subject to an unexcused procedural default, the Court

concludes that permitting amendment of the petition to include them would be futile. *Accord*

*Beverly v. Walker*, 899 F. Supp. 900, 908 (N.D.N.Y. 1995) ("Because the state court made an

adequate and independent finding of procedural default, and because petitioner has not made any

attempt to show cause or prejudice, this Court will not review his claim. Accordingly it would be

futile to allow petitioner to amend his habeas petition."). Therefore, the Court recommends

dismissing Mills' motion to amend.

For essentially the same reasons, Mills' motion to stay should be denied. As the Supreme Court stated in *Rhines v. Weber*, 544 U.S. 266, 277 (2005), district courts should not permit petitioners to invoke the stay-and-abeyance procedure unless they can show "good cause" for their failure to timely exhaust and that the claims are "potentially meritorious."  I note that Mills does not explain why he did not exhaust the three claims raised in his C.P.L. § 440.10(2)(c) before filing his federal habeas petition. As respondent points out, the C.P.L. § 440.10 court denied the motion to vacate because the grounds raised were apparent on the appellate record and could have been, but unjustifiably were not, raised on direct appeal. *See* N.Y. Crim. Proc. Law § 440.10(2)(c). Respondent argues that Mills necessarily cannot show good cause for exhausting them at an earlier time. The absence of "good cause" for the failure to exhaust is fatal to Mills' ability to fulfill the *Rhines* standard. *See Rhines*, 544 U.S. at 277. ("Because granting a stay effectively excuses a petitioner's failure to present his claims first to the state courts, stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court.").

In addition, as discussed above, the claims are subject to an unexcused procedural default under the adequate-and-independent state ground doctrine. Therefore, they are precluded from further federal habeas review. Because this Court may not review the merits of procedurally defaulted claims, they cannot serve as "potentially meritorious" bases for habeas relief. Accordingly, the Court believes that it would not be an appropriate exercise of discretion to grant a stay in this case, and recommends dismissal of the stay motion with prejudice. *See Rhines,* 544 U.S. at 277-78 (instructing that "even if a petitioner had good cause for that failure, the district court would abuse its discretion if it were to grant him a stay when his unexhausted

claims are plainly meritless").

## III.   General Legal Principles Applicable to § 2254 Habeas Petitions

It is well established that a federal habeas court does not sit to correct a misapplication of state law, unless such misapplication violates the Constitution, laws, or treaties of the United States. *See* 28 U.S.C. § 2254(a) ("The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *only* on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.") (emphasis supplied); *see also Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991).

To obtain a writ of habeas corpus under 28 U.S.C. § 2254, as amended in 1996, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual determination in light of the evidence presented in state court.  *See* 28 U.S.C. § 2254(d)(1), (2); *Williams v. Taylor*, 529 U.S. 362, 375-76 (2000).

## IV.   Analysis of the Petition

### A.   Ground One: The Grand Jury should have been instructed concerning the defense of justification (self-defense).

Mills contends that the grand jury which indicted him should have been instructed by the prosecuting attorney regarding the defense of justification (self-defense), based upon a prior statement made by Turner to the police that Jaycox had displayed a gun just before the shooting. Turner did not testify that she saw Jaycox display gun, when she actually testified before the

grand jury. *See* Petitioner's Appellate Brief at 13, People's Appellate Brief at 7 (Respondent's

Exhibit B). When Turner was questioned at the grand jury about that prior statement to police

mentioning a gun, Turner admitted that she did not know whether what she saw was a gun, a belt

buckle, or some other object. Resp't Mem. at 3; T.511-12. Thus, during her sworn testimony at

the grand jury, Turner renounced her prior statement to the police.

When this claim was raised on direct appeal, the Appellate Division rejected it as

follows: "Contrary to defendant's contention, the prosecutor was not required to instruct the

Grand Jury on the defense of justification. The prosecutor must instruct the Grand Jury

concerning only 'those "complete" defenses which the evidence will support,' and here the

evidence before the Grand Jury did not support the defense of justification[.]" *People v. Mills*,

291 A.D.2d 844, 844 (App. Div. 4th Dept. 2002) (quotations and citations omitted).

Respondent argues that on federal habeas review, Mills' complaint regarding the alleged

error in the instructions to the grand jury is not cognizable. *See* Respondent's Memorandum of

Law ("Resp't Mem.") at 2-3. Respondent also argues that the claim is, in any event, without

merit.

First, I agree with respondent that the claim is not a proper basis for habeas relief. As the

Supreme Court explained in *United States v. Mechanik*, 475 U.S. 66 (1986), in the context of a

federal grand jury proceeding, a petit jury's subsequent verdict of guilty transforms any defect in

the earlier grand jury proceedings into harmless error by establishing both probable cause to

indict the defendant and the defendant's guilt beyond a reasonable doubt of the charged crimes.

*Mechanik*, 475 U.S. at 70. The Second Circuit has applied *Mechanik*'s reasoning in the context

of state petitioners collaterally challenging their convictions under 28 U.S.C. § 2254. *See Lopez*

*v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989). Noting that *Mechanik* held that federal grand jury rights are not cognizable on direct appeal when they have been rendered harmless by a petit jury's guilty verdict, the Second Circuit held that analogous claims regarding a *state* grand jury proceeding are *a fortiori* foreclosed in a collateral attack on a state conviction brought in federal court. *Lopez*, 865 F.2d at 32. I agree with respondent that Ground One, which alleges defects in the grand jury proceeding, is not cognizable on federal habeas review.  Accordingly, I recommend that it be dismissed on that basis.

     **B.    Ground Two: The trial court erroneously declined to charge the jury on criminally negligent homicide and manslaughter.**

     When Mills asserted this claim on direct appeal, the Appellate Division held that "County Court properly denied defendant's request to charge reckless manslaughter and criminally negligent homicide as lesser included offenses of depraved indifference murder. There is no reasonable view of the evidence that defendant committed the lesser offenses but not the greater[.]" *People v. Mills*, 291 A.D.2d at 845 (citing, *inter alia*, *People v. Jin Wai*, 283 A.D.2d 326 (App. Div. 1st Dept. 2001) ("The court properly declined to submit manslaughter in the second degree to the jury as a lesser included offense of depraved indifference murder. There was no reasonable view of the evidence, even when viewed most favorably to defendant, that defendant was merely reckless but did not evince a depraved indifference to human life and create a grave risk of death to bystanders when he fired his gun on a crowded street[.]")).

     Respondent argues that Mills' claim regarding the failure to charge the jury on lesser included, non-capital offenses in this non-capital case does not present a cognizable claim for this habeas proceeding. Resp't Mem. at 4-6 (citing, *inter alia*, *Jones v. Hoffman*, 86 F.3d 46, 48 (2d Cir. 1996); *Beck v. Alabama*, 447 U.S. 625 (1980)). In *Beck v. Alabama*, the Supreme Court

held that in capital (death-penalty) cases, the trial judge must instruct the jury on lesser included, non-capital offenses, where the evidence presented so warrants. *Id.* at 627. The failure to do so violates the Eighth Amendment and the Due Process clause. *Id.* The Supreme Court in *Beck* expressly declined to consider whether such a requirement would also apply in the non-capital context, however. *Id.* at 638 n. 14; *see also Gilmore v. Taylor*, 508 U.S. 333, 361 (1993) (Blackmun, J., dissenting) ("We left open the question whether *Beck* applies in the noncapital context.") (citation omitted).

In the years following *Beck*, the Second Circuit likewise refrained from ruling on the issue. *See  Rice v. Hoke*, 846 F.2d 160, 164 (2d Cir.1988); *Knapp v. Leonardo*, 46 F.3d 170, 179 (2d Cir.1995) ("Neither the Supreme Court nor this circuit has decided whether the failure to instruct a jury on lesser-included offenses in noncapital cases is a constitutional issue that may be considered on a habeas petition."); *Jones v. Speckard*, 827 F. Supp. 139, 146 (W.D.N.Y 1993) (*dictum*), *aff'd mem.*, 14 F.3d 592 (2d Cir.1993); *Smithwick v. Walker*, 758 F. Supp. 178, 187 (S.D.N.Y 1991), *aff'd mem.*, 948 F.2d 1278 (2d Cir.1991).

In 1996, the Second Circuit confronted the issue again in *Jones v. Hoffman*. The *Jones* panel noted the Supreme Court's clear unwillingness to decide whether the failure to charge lesser-included offenses in a non-capital case rises to the level of a constitutional claim. That, combined with the presence of a split among the circuit courts on the issue, led the Second Circuit to rule that the petitioner's habeas claim in *Jones* would amount to the announcement of a new rule of constitutional interpretation, and thus his claim was precluded under the non-retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288 (1989). *Jones v. Hoffman*, 86 F.3d at 48 (citing *Turner v. Marshall*, 63 F.3d 807, 819 (9th  Cir. 1995) ("With the intercircuit split on

whether the lack of a lesser included offense instruction in a noncapital case presents constitutional error, any finding of constitutional error would create a new rule, inapplicable to the present case under *Teague*.").[4]

Because the Supreme Court has not decided whether there is a constitutional right to a lesser-included-offense charge in non-capital cases, *Beck*, 447 U.S. at 638 n. 14, there is no "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), on this issue. Thus, the Appellate Division's ruling that the requested lesser included offenses were not warranted as a matter of New York state law cannot be said to have been "contrary to" "clearly established Federal law." Similarly, the Appellate Division cannot be said to have unreasonably applied federal law on this issue. First, the Supreme Court has explicitly declined to rule on the precise question in *Beck*, and, second, and the Second Circuit has not suggested that Supreme Court precedent has implied established a principle that denial of lesser-included-offense instructions in non-capital cases may violate due process. *White v. Fischer*, No. 04 CV 5358(GBD)(FM), 2008 WL 4210478, at *10 (S.D.N.Y. Sept. 12, 2008) (denying habeas relief where petitioner convicted of first degree manslaughter claimed that the trial court's erroneously refused to instruct the jury with regard to the lesser included offense of second degree manslaughter) (citing 28 U.S.C. § 2254(d)(1); *Beck*, 447 U.S. at 638 n. 14; *Jones*, 86 F . 3d at 48). For the foregoing reasons, I recommend that Ground Two be dismissed.

### C.    Ground Three: The trial court erroneously instructed the jury regarding the defense of justification.

Mills contends that the trial court deprived him of due process by improperly instructing

---

[4]    *Accord Rasmussen v. Kupec*,  No. 02-2208, 54 Fed. Appx. 518, 519 (2d Cir. Jan 17, 2003) (unpublished opn.).

the jury in response to a note received during jury deliberations regarding the justification

defense.[5] The trial court's initial charge to the jury stated, in relevant part, as follows:

> [A] person may lawfully use deadly physical force against another person when he reasonably believes that such use of deadly physical force is necessary to defend himself or a third person from what he reasonably believes to be the imminent use of deadly physical force against him.
>
> The law further provides that even if you reasonably believe both of the above, a person may, nevertheless, not use defensive physical force if he knows he can with complete safety to himself or others avoid such use of deadly physical force by retreating. As with all factual issues for the jury, you should first review all of the evidence you find to be believable and find what, in fact, took place between this defendant and Nola Okorougo before and during their encounter. Only then can you decide what this defendant reasonably believed.
>
> In deciding what this defendant reasonably believed, the law imposes upon the jury two tests. The first test is a subjective test, that is, what this defendant, not some other person, in fact, believed. To apply this test you should figuratively put yourself in the shoes of the defendant and consider how the situation appeared to him. You should consider, for example, what was said and done before and during the encounter, whether any weapon was possessed or used by any other person, any differences in physical size or attributes among the parties, any prior experiences of the same or similar nature experienced by the defendant, any prior knowledge this defendant had of the other's reputation for violence, any prior specific assaults upon the defendant or upon others, or any other prior threats made against the defendant. All of these are subjective factors and should be considered by you in deciding what this defendant actually believed. Upon the basis of all of the foregoing you should then decide whether this defendant believed that his use of deadly physical force was necessary to defend himself or a third person, and that it was necessary to defend himself from the imminent, that is, immediate use of offensive deadly physical force against him. If the evidence satisfies you that the defendant so believed, then you should turn to the second test, and the second test is what a reasonable person would believe under the circumstances. In other words, what [sic] the defendant believed reasonable under all of the circumstances?

---

[5]    New York Penal Law § 35.15(2) provides in pertinent part with respect to the defense of justification: "A person may not use deadly physical force upon another person . . . unless: (a) He reasonably believes that such other person is using or about to use deadly physical force.  Even in such case, however, the actor may not use deadly physical force if he or she knows that with complete personal safety, to oneself and others he or she may avoid the necessity of so doing by retreating . . . ." N.Y. PENAL LAW § 35.15(2)(a).

The second test requires you to consider whether the average person finding himself in the same situation as did the defendant would also conclude that defensive physical force was necessary to defend himself against the use of offensive deadly physical force. As I informed you earlier and do again, the burden is upon the People to prove to your satisfaction beyond a reasonable doubt that this defendant did not, in fact, act in self-defense, that he did not reasonably believe that the use of deadly physical force was necessary to defend himself or a third person against what he believed to be reasonably the use of deadly physical force against him or a third person and that the defendant, in fact, knew that he could have retreated with complete safety to himself or to others. If the People fail to so convince you beyond a reasonable doubt, then you must find the defendant acted in self-defense and find him not guilty of the crime of Murder in the 2nd degree.

T.659-61. There was no objection to the foregoing charge by trial counsel or the prosecutor.[6]

Jury deliberations commenced at 10:27 a.m., and at about 12:05 p.m., the trial court received a request for a definition of self-defense. The trial court re-read its original instructions on justification, to which there was no objection by defense counsel or the prosecutor. *See* T.674-81.

At about 5:40 p.m., the jury sent out a note asking,

When you, the judge, were talking about 'self Defence [sic]' did you say that the need to feel threatened or in possible life threatening situation must be determined at that moment and not prior acts or situations which came days or weeks before.

T.685. The note was marked as Court Exhibit 6. It is not clear from the trial transcript whether the trial judge consulted with the attorneys before answering this question in the following manner:

*You're asking essentially does the need to feel threatened or in a life threatening situation need to be at the moment? Is that the question? Meaning the moment when deadly physical force is used?* All right the answer is yes, okay. Basically, in order to justify the use of deadly physical force, the defendant must reasonably

---

[6]        On appeal, neither appellate counsel nor Mills, in his *pro se* brief, assigned error to it. Indeed, it was a correct statement of New York's law on the justification defense. *See*, *e.g.*, *People v. Wesley*, 76 N.Y.2d 555 (N.Y. 1990).

believe three things. First, that such deadly physical force is necessary to defendant himself from the imminent use of deadly physical force against him or a third person and that he cannot with complete safety withdraw. So, sure, you take into consideration events that may have happened in the past, but the test for whether or not a person is justified in using deadly physical force is whether he is threatened at the time he uses the deadly physical force with the immediate use of deadly physical force against him.

Does that answer the question? Okay.

T.685-86 (emphasis supplied). There was no objection to the trial court's paraphrasing, set out in italics, of the jury's note by either trial counsel or the prosecutor or the jury. I note that it would have been helpful if there was some indication in the record of the jury's response to the judge's query, "Is that the question?" However, reading the above in its entirety, the reasonable inference is that the jury responded in a non-verbal way (e.g., by nodding in assent) to the judge's paraphrasing of the contents of the note.

Then, Juror Number 5 asked the trial court to repeat the supplemental instruction (quoted above), and the court responded as follows:

> The Court:   You're asking in your question essentially whether or not the person who uses deadly physical force needs to feel threatened *at the time he uses the deadly physical force.* I don't know how I can make it any clearer. For example, if you thought somebody was going to kill you three weeks ago, you can't today decide that you're going to kill that person because you were threatened three weeks ago. Okay, the use of deadly physical force is justified only when the person reasonably believes that deadly physical force is about to be used against him and that the use of that force is imminent. Somebody is going to kill him or attempt to kill him at that time.
>
> Juror No. 5:   *At that split second*?
>
> The Court:   At the time he uses the deadly physical force.
>
> Juror No. 5:   Okay.
>
> . . .
>
> The Court:   And that's the only way you're justified in using physical force, when you perceive, when you reasonably believe that someone is about to use deadly physical force against you or a person, a third

person, and you reasonably believe that that's about to happen and that it's necessary for you to use the deadly physical force to defend yourself and you can't retreat . . . . I mean, obviously if someone is about – you see someone about to use deadly physical force, if you somehow detect it, that doesn't mean you can kill him; or, if you are protected, or if there is some way to retreat, it has to be that a person reasonably believes that a person is going to use deadly physical force at that time, not something that he perceived in the past.

T.686-87 (emphases supplied). It appears from Juror No. 5's questions that the jury was focused on the "imminence" requirement of the jury charge. I note that there was no objection by defense counsel or the prosecutor to the trial court's instructions in response to the jury's written query and Juror Number 5's follow-up question.

There were not any further requests for clarification on self-defense from the jury.

On direct appeal, Mills' appellate counsel conceded that the issue was unpreserved due to the lack of a timely objection, but argued that the error was fundamental and warranted discretionary review in the interest of justice. Petitioner's Appellate Brief ("Pet'r App. Br.") at 33 (Respondent's Exhibit ("Resp't Ex.") B). The People argued that the issue was unpreserved, and that the trial court's instruction, in any event, was a correct  statement of the law. The Appellate Division apparently included the issue among the contentions that it found to be unpreserved for review. *People v. Mills*, 291 A.D.2d at 845 ("Defendant's remaining contentions are unpreserved for our review (*see*, [N.Y. Crim. Proc. Law] 470.05(2)), and we decline to exercise our power to review them as a matter of discretion in the interest of justice (*see*, [N.Y. Crim. Proc. Law] 470.15(6)(a)).").

In the present proceeding, respondent has set forth argument on the merits of the jury instruction claim and has *not* raised the affirmative defense of procedural default based upon the

Appellate Division's reliance upon a state procedural rule as the basis for dismissal. *See* Respondent's Memorandum of Law ("Resp't Mem.") at 7-9 (Docket No. 6). Therefore, I conclude that the affirmative defense has been waived.

As discussed further below, after reviewing the challenged instruction in light of the jury instructions as a whole, I recommend finding that Mills' due process rights were not violated, and, if there was any error, it was harmless.

"[T]he fact that [a jury] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991) (citing *Marshall v. Lonberger*, 459 U.S. 422, 438, n. 6 (1983)). Rather, "[t]he question in [ ] a collateral proceeding is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' not merely whether 'the instruction is undesirable, erroneous' or even 'universally condemned.'" *DelValle v. Armstrong*, 306 F.3d 1197, 1201 (2d Cir. 2002) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)). *See also Middleton v. McNeil*, 541 U.S. 433 , 124 S.Ct. 1830, 1832 (2004) (*per curiam*). In weighing the prejudice from an allegedly improper charge, a reviewing court must view the instruction in its total context. *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973). It is well-established that "a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *McNeil*, 124 S.Ct. at 1832 (quoting *Boyde v. California*, 494 U.S. 370, 378 (1990)).

Mills does not contend that there was error in the court's initial charge on justification, or in its re-reading of that charge in response to the jury's first request for clarification. Rather, it is the trial judge's supplemental instructions given in response to the jury note that, according to Mills, were erroneous and misleading. New York's Criminal Procedure Law § 310.30 provides

that when responding to a jury question, "the [trial] court 'must give such requested information or instruction as the court deems proper.' Determination of the appropriate answer rests within the discretion of the trial court, so long as the answer given does not deprive a defendant of a constitutional right." *McShall v. Henderson*, 526 F. Supp. 158, 161 (S.D.N.Y.1981) (quoting N.Y. CRIM. PROC. LAW § 310.30); *see also People v. Almodovar*, 62 N.Y.2d 126, 131-132; *accord Edwards v. Fischer*, 414 F. Supp.2d 342, 358 (S.D.N.Y. 2004) (citations omitted).

In the context of a challenge to a supplemental jury instruction on the direct appeal of a federal conviction, the Supreme Court has noted that "[o]nce the judge has made an accurate and correct charge, the extent of its amplification must rest largely in his discretion. The trial judge, in the light of the whole trial and with the jury before him, may feel that to repeat the same words would make them no more clear to indulge in variations of statement might well confuse." *United States v. Bayer*, 331 U.S. 532, 536 (1947) (quoted with approval in *United States v. Sacco*, 436 F.2d 780, 783 (2d Cir.1971) and *Ortiz v. Artuz*, 113 F. Supp.2d 327, 339 (E.D.N.Y. 2000)); *see also McShall*, 526 F. Supp. at 162.

Mills faults the trial court's supplemental instruction because, he argues, it implies that the subjective element of the defense is merely an offhand consideration rather than "an integral part of the determination." Pet'r App. Br. at 34  (Resp't Ex. B). Mills points specifically to the following language by the trial judge: "So, sure, you take into consideration events that may have happened in the past, *but the test* for whether or not a person is justified in using deadly physical force is whether he is threatened at the time he uses the deadly physical force with the immediate use of deadly physical force against him." *Id.* (emphasis by petitioner). Miller contends that this language "gave the impression that in the final  analysis the overall

determination was an objective one" and, furthermore, failed to answer the jury's question. *Id.* at 34-35. Mills asserts that the jury's note and follow-up question from Juror Number 5 indicates that the "jury obviously was confused as to whether or not a person's perception or reasonable belief as to whether an actor is going to use deadly physical force against him could be formed by reference to prior dealings with that person." *Id.* at 33.

As Mills points out, in *People v. Goetz*, 68 N.Y.2d 96 (N.Y. 1986), the New York Court of Appeals "sanctioned a jury's consideration of prior acts of violence against whom the deadly physical force is being used in determining the state of mind of the defendant and the reasonableness of his response." Pet'r App. Br. at 34 (citing *Goetz*, 68 N.Y.2d at 113). *Goetz* confirmed that "a defendant charged with homicide could introduce, in support of a claim of self-defense, evidence of prior acts of violence committed by the deceased of which the defendant had knowledge." *Goetz*, 68 N.Y.2d at 113 (citing *People v.Miller*, 39 N.Y.2d 543). Thus, there is a subjective element to the "reasonableness" determination. *See id*.

However, *Goetz* cautioned, the language allowing consideration of prior acts by the victim does not mean that a "wholly subjective test is appropriate." The *Goetz* court concluded that the justification statute "retains an objective element," *Wesley*, 76 N.Y.2d at 559 (citing *Goetz*, 68 N.Y.2d at 112), and Penal Law § 35.15 requires a jury to consider "both subjective and objective factors in determining whether a defendant's conduct was reasonable." *Wesley*, 76 N.Y.2d at 559.

As the Second Circuit has observed, "justification is a state-law defense." *DiGuglielmo v. Smith*, 366 F.3d 130, 136 (2d Cir. 2004) (citing N.Y. PENAL LAW § 35.15 (McKinney 1975 & Supp.1987); *Johnson v. Rosemeyer*, 117 F.3d 104, 111 (3d Cir. 1997)). Thus, "[a] state prisoner

'cannot point to a federal requirement that jury instructions on . . . justification . . . must include particular provisions." *Id.* (quoting *Johnson v. Rosemeyer*, 117 F.3d at 111 and citing *id.* at 110 (noting that alleged "errors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause"); *accord Hudson v. New York*, No. 07 CV 1327(CBA), 2007 WL 3231970, at *7 (E.D.N.Y. Oct. 30, 2007) ("As is discussed above, in this case the erroneous jury charge [which failed to instruct that there was no duty to retreat in petitioner's case] was unlikely to have any effect on the trial, let alone so infect the entire trial such that it violated Due Process. Accordingly, the erroneous justification instruction does not amount to a constitutional violation under *Cupp*, and were the Court to reach the merits of this ground for habeas relief, it would be rejected.") (citing *DiGuglielmo*, 366 F.3d at 136).

Here, the trial judge's main instruction on justification, which the jury heard twice, was correct as a matter of state law. *See People v. Wesley*, 76 N.Y.2d at 555. Unlike the jury in *Wesley*, the jury at Mills' trial was told "in words [and] substance, that in deciding the question of reasonableness they 'must consider the circumstances [that] defendant found himself in,' as well as defendant's background and other characteristics and the attributes of the other persons involved[.]" *Wesley*, 76 N.Y.2d at 560 (quoting *Goetz,* 68 N.Y.2d at 113).

With regard to assessing the propriety of the trial judge's supplemental instruction on justification, the Second Circuit's comments in *Arroyo v. Jones*, 685 F.2d 35, 39 (2d Cir. 1982), are instructive:

> A supplemental charge must be viewed in a special light. It will enjoy special prominence in the minds of the jurors for several reasons. First, it will have been the most recent, or among the most recent, bit of instruction they will have heard, and will thus be freshest in their minds. Moreover, it will have been isolated from the other instructions they have heard, thus bringing it into the foreground of their thoughts. Because supplemental instructions are generally brief and are given

> during a break in the jury's deliberations, they will be received by the jurors with heightened alertness rather than with the normal attentiveness which may well flag from time to time during a lengthy initial charge. And most importantly, the supplemental charge will normally be accorded special emphasis by the jury because it will generally have been given in response to a question from the jury.

*Arroyo*, 685 F.3d at 39 (quoted with approval in *Rock v. Coombe*, 694 F.2d 908, 915 (2d Cir. 1982), *cert. denied*, 460 U.S. 1083)). Nevertheless, "[t]he mere fact that an erroneous statement appears in a supplemental charge, however, does not automatically mean that the jury has been unduly influenced by it. The supplemental charge itself should be viewed as a whole and the offending statement read in context in order to evaluate its likely effect on the jury." *Rock v. Coombe*, 694 F.2d at 915. *See also* Resp't Mem. at 8 (citing *United States v. Tillem*, 906 F.2d 814, 826 (2d Cir. 1990) ("The legal sufficiency of supplemental instructions is assessed in light of the jury instructions as a whole.") (citation omitted).

As noted above, the jury sent a note asking whether the defendant's "need to feel threatened or in possible life threatening situation must be determined at that moment and not [sic] prior acts or situations which came days or weeks before." Mills argues that the only reasonable interpretation of the question was that it asked whether petitioner's previous fights with Jaycox and the victim could be considered *at all*. The Court does not agree, and believes that it was just as reasonable, and in fact more reasonable, to "interpret[ ] this question to go to the issue of whether defendant might be justified in firing his weapon if Jaycox was not using or about to use deadly physical force against defendant (*see*, Penal Law § 35.15(2))." Peo. App. Br. at 10, Resp't Ex. B.

The Court finds it significant that the jury had asked whether the "need to feel threatened or in possible life threatening situation must be determined *at that moment* . . . ." T.685

-36-

(emphasis supplied). That the gist of the question was whether Mills needed to feel threatened *at the time* of the incident is borne out by the trial judge's preliminary questions to the jury before he began his answer, when he paraphrased their initial question.. "[S]ince the trial court is in the best position to interpret the jury's request, it has discretion to fashion the appropriate response and may even respond by repeating its earlier instructions on the same subject." *People v. Ellis*, 183 A.D.2d 534, 536 (App. Div. 1st Dept. 1992)  (citations omitted). Although the jury's note was not entirely clear, the trial judge apparently was able to interpret the question the jurors were asking and answered it to their satisfaction. For the reasons discussed in the foregoing paragraphs, I recommend finding that there was neither an error of state law in the trial court's supplemental instruction, nor an error of federal constitutional magnitude. Accordingly, I recommend that Ground Three be dismissed.

**D.**      **Ground Four: The trial court's *Allen* charge was erroneously given.**

At 4:53 p.m., the jury sent out a note that read as follows: "Tammy, juror #11 wants to go home, can't do this[,] doesn't feel good." Pet'r App. Br. at 41 (citing Court Exhibit No. 4); T.681. The note continued by enquiring whether the rest of the jurors "could leave the room for a break." *Id.* The trial judge indicated that he had consulted with counsel, and it was his understanding that both attorneys felt that he

> should simply call [the jury] in and essentially give them an *Allen*[7] charge, something along the lines of [an] *Allen* charge, advising them that they can't go home, and it doesn't necessarily feel good, and they indicated that they could do

---

[7]      "The term '*Allen* charge' is a generic term used for a type of supplemental instruction that is given to a deadlocked jury, first approved by the Supreme Court in *Allen v. United States*, 164 U.S. 492 (1896). A traditional *Allen* charge reminds the jurors about the importance of obtaining a verdict and encourages jurors to listen 'to each other's arguments' while also emphasizing that 'the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows.' *Id.* at 501." *Smalls v. Batista*, 191 F.3d 272, 275 n.1 (2d Cir. 1999).

this. That's what they took an oath to do and that they can't get a break. They can take a break from deliberations for a few minutes, but they can't walk around the building, okay? Is that pretty much what everyone agrees to?

T.681. Trial counsel expressly concurred, as did the prosecutor. T.681-82. The trial court then

issued the following instruction to the jury:

> Okay, I have your note, and I guess I have to respond to this by indicating to you that we have got a few problems with what you said here. When a juror wants to quit in the middle of this thing, I mean, it's kind of not acceptable at this point. When you took your oath to be jurors, you knew what was involved. We told you about the case and you indicated that you would listen to the evidence and render a verdict in accordance with the law as I gave it to you. Frankly, you have to keep trying to do that, all right. To indicate after whatever it is here, about six hours, that you quit, doesn't help us. Obviously, no one is in a better position than you are at this point to determine this case. You heard the evidence. If it's at all possible, you should agree on a verdict, but only on a verdict that's a just verdict. I don't want anybody surrendering his or her honest opinion as to the weight of the evidence in this case just for the purpose of returning a verdict and to get out of here. That's not the way it works. And if you're going to do that, then you're not fulfilling your oath as a juror. So, what you need to do is go back and discuss what the problems are, what the evidence shows, what you believe the evidence to be and express your views about the evidence and try to come to an agreement. You need to put aside passion and prejudice and sympathy and just talk about the evidence and facts in this case and think about what you heard and what it means. So, I think you just ought to go over the testimony of the witnesses carefully, you know. Think about it, weigh it, you know, don't close your mind to what other people have to say, and be willing to discuss fully any issue that comes up. I know it's tough. Nobody said it was an easy job, but, again, you're in a position better than anyone at this point; and frankly, if you don't reach a decision, we do this again, and no other future jury is going to be in a better position than you are to decide the facts in this case, so, if you can, without violence to individual judgment here, go up and make a decision in this case, I'm going to order you to do so.

> Now, when you say can we take a break–which is the next question–you can take a break from your deliberations, but you can't run around the building. I have to keep you together and under the supervision of the deputies. That's simply to make sure that no one is talking to you or you're not talking to anyone else. . . . I know it's not easy. I know it's a tough thing to do, but as I said, you're in a position to do it and I'm going to ask you to go back and see whether you can come up and reach an agreement. If I can be of any help, I'll be happy to help.

T.682-84. There was no objection by either defense counsel or the prosecutor to the "*Allen* charge." *Id.*

The trial court then addressed another note from the jury asking if they could "ask the judge a specific question." T.684. The trial court responded yes, but stated that they had to "write it down" because he did not "want to start deliberating with [them]." T.684. Before the jury was excused, the trial judge reiterated, "[N]o one should . . . . compromise a consciously-held view merely for the purpose of getting out of here and returning a verdict. Don't do that. Please don't do that. You have got a responsibility here, and it's important that you abide by your oath." T.685. The jury returned to their deliberations. They did not send out any more notes before they reached their verdict.

Mills contended on direct appeal that the trial court's instruction "was an inadequate response t the issues raised by juror number eleven who allegedly wanted to go home because she 'doesn't feel good' and apparently felt that she could not 'do this.'" Pet'r App. Br. at 41. The People responded that the claim was unpreserved for review because defense counsel did not object to the reading of an *Allen* charge. Peo. App. Br. at 12. The People also noted that the trial court invited further questions, and the jury "did not ask about physical illness of a juror," indicating that it was no longer a problem. *Id.* The Appellate Division included this claim among those that it found to be unpreserved for review, and dismissed it without reaching the merits.

In his opposition memorandum of law, respondent asserts that Ground Four "is both procedurally barred and unexhausted." Resp't Mem. at 10. Thus, respondent has explicitly raised the affirmative defense of procedural default. As respondent points out, the record reveals that the jury's note was read to both attorneys, after which they agreed that an *Allen* charge was

appropriate. *Id.* (citing T.681-82). Also, respondent notes, petitioner's appellate counsel did not include this claim in the leave application to the Court of Appeals, which means that the claim is unexhausted. *Id.* (citing *Grey v. Hoke*, 933 F.2d 117 (2d Cir. 1991); N.Y. Court Rules § 500.10). Finally, respondent argues that the claim is without merit. Mills asserts that ground four *is* exhausted because, in his *coram nobis* application, "he attacked appellate counsils [sic] ineffectiveness for her failure to raise ineffective assistance for his failure to object to the courts [sic] reading of the *Allen* charge to the jury . . . ." Petitioner's Reply in Support of Renewed Motion to Stay and to Amend (Docket No. 22).

I agree with respondent that the Appellate Division's ruling on this claim as "unpreserved" is an adequate and independent state ground for its decision that operates to create a procedural bar to habeas review of the text of the trial court's *Allen* charge. *Accord, e.g.*, *Campos v. Portuondo*, 193 F. Supp.2d 735, 744 (S.D.N.Y. 2002). Habeas review of this claim is therefore precluded unless petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *accord, e.g.*, *Messiah v. Duncan*, 435 F.3d 186, 195 (2d Cir. 2006). "Cause"represents a threshold issue, and when the habeas court does not find cause it need not also evaluate the issue of prejudice. *Engle v. Isaac*, 456 U.S. 107, 134 n. 43 (1982) (noting that in its previous decisions, it had "stated these criteria in the conjunctive," and therefore "cause" and "prejudice" test is framed in the conjunctive) (citing *Wainwright v. Sykes*, 433 U.S. 72, 90-91 (1977)); *see also United States v. Frady*, 456 U.S. 152, 167 (1982) (declining to consider "cause" when it clearly found no "prejudice").

Here, because his claim regarding the *Allen* charge is without merit, as discussed below, I

recommend finding that Mills was not prejudiced by appellate counsel's omission of the claim in the leave letter to the court of appeals. This is because there is no reasonable probability that a stand-alone claim regarding the *Allen* charge would have resulted in a more favorable result on appeal for Mills.

"While the reasoning in the case of *Allen v. United States*, 164 U.S. 492 . . . , rests on the supervisory power of the federal courts, the issue of jury coercion is of federal constitutional dimension." *Campos v. Portuondo*, 193 F. Supp.2d at 745 (citing *Lowenfield v. Phelps*, 484 U.S. 231, 240-41 (1988) (reviewing jury charge in state habeas petition for "constitutional" error); *Smalls v. Batista*, 191 F.3d 272, 277 (2d Cir.1999) (same)). The New York state courts have recognized that the propriety of *Allen* charges must be judged on federal constitutional principles. *Id.* (citing *People v. Antommarchi*, 80 N.Y.2d 247, 252-53  (1992)). The Second Circuit has consistently approved the use of an *Allen*-type charge "as long as such a charge is carefully crafted to avoid coercing jurors." *United States v. Fermin*, 32 F.3d 674, 680 (2d Cir.1994), *overruled on other grounds*, 516 U.S. 137 (1995); accord Smalls v. Batista, 191 F.3d at 278; *United States v. Melendez*, 60 F.3d 41, 51-52 (2d Cir.1995), *vacated on other grounds*, 516 U.S. 1105 (1996).  The Second Circuit "has viewed '[t]he propriety of an *Allen*-type charge [as] depend[ing] on whether it tends to coerce undecided jurors into reaching a verdict by abandoning without reason conscientiously held doubts.'" *United States v. Roman*, 870 F.2d 65, 77 (2d Cir. 1989) (quoting *United States v. Robinson*, 560 F.2d 507, 517 (2d Cir.1977) (*en banc*), *cert. denied*, 435 U.S. 905 (1978)); *accord United States v. Ruggiero*, 928 F.2d 1289, 1299 (2d Cir.1991).

As to the propriety of giving an *Allen*-type charge in the first instance, I note that the trial

court retains the discretion to determine under what set of circumstances an *Allen* charge should be given. *Campos*, 193 F. Supp.2d at 746-47 (citing *United States v. Hynes*, 424 F.2d 754, 758 (2d Cir.1970)).  Mills contends that the trial court should have made further inquiry into Juror Number 11's alleged illness, rather than giving an *Allen* charge. However, the implication of one juror wanting to go home and not being able to "do this" was that the jury would be unable to fulfill the requirement of a unanimous verdict by twelve jurors. Thus, I cannot say that the trial court abused its discretion in issuing an *Allen*-type charge. Moreover, as respondent notes, the issue of Juror 11 "not feeling good" was never raised again during the jury's deliberations, indicating that it was no longer an issue. Accordingly, I recommend concluding that the trial court's issuance of an *Allen*-type instruction under these circumstances was well within its discretion.

Turning next to the propriety of the language used, the Court has quoted it at length above. One factor that demonstrates a lack of juror coercion is the inclusion of "cautionary language which would discourage jurors from surrendering any conscientiously held beliefs." *Smalls*, 191 F.3d at 278; *Ruggiero*, 928 F.2d at 1299. The Second Circuit has described such language as "negat[ing] coercion." *Ruggiero*, 928 F.2d at 1299 (citing cases)). The charge given in Mills' case is "filled with admonitions to the jury that negated any possible coercive effect," *Campos*, 193 F. Supp.2d at 748. In particular,  the trial judge repeatedly reminded the jurors that they should not relinquish any view which they held in good conscience. Thus, Mills' case is in contrast with *Smalls v. Batista*, 191 F.3d 272, wherein the trial judge erroneously and coercively informed the jurors that they had a responsibility to persuade other jurors without ever suggesting that they should not surrender their own beliefs. *Id.* at 280.

-42-

Although the trial judge in Mills' case suggested that if the jury did not come to a verdict, that a new jury would have to "do this again," he did not insist on a verdict or state that jury deadlock hung was an unacceptable result. *Cf. Jenkins v. United States*, 380 U.S. 445, 446 (1965) (error where judge stated to jury, "[y]ou have got to reach a decision in this case"). Rather, the trial court implored the jurors not to reach a verdict simply in order to be done with deliberating on the case, and forcefully admonished them that "not feeling good" was not an acceptable reason to avoid deliberating and reaching a verdict. Read in its entirety, the instruction was more "a clarification of the jurors' individual responsibilities" rather than "an exhortation that they reach a decision." *United States v. Roman*, 870 F.2d 65 (2d Cir. 1989).

As discussed above, the trial judge appropriately exercised his discretion in issuing an *Allen*-type charge in the situation presented at Mills' trial. Defense counsel expressly agreed to the propriety of doing so. Moreover, the charge as given was a correct statement of law and was not coercive. Mills was not prejudiced by appellate counsel omitting a claim based on the giving of this charge because there was no reasonable probability that it would have persuaded the Appellate Division to reverse his conviction. And, because the claim was not meritorious, appellate counsel was not unreasonable in declining to include it in the appellate brief. Finally, Mills has made no attempt to come forward with new evidence that he is factually innocent. Therefore, I recommend finding that Ground Four is subject to a procedural default. Accordingly, it should be dismissed.

### E.    Ground Five: Appellate counsel provided ineffective representation.

As his last ground for relief, Mills contends that appellate counsel was ineffective because she failed (1) to challenge the sufficiency and weight of the evidence supporting his

convictions and (2) to challenge trial counsel's failure to have objected to the trial court's

supplemental instruction regarding the justification defense and *Allen* charge. Mills raised these

claims by means of a *coram nobis* petition, which was denied by the Appellate Division in a one-

word summary order dated June 13, 2003. Mills unsuccessfully sought leave to appeal the denial

of *coram nobis* relief to the New York Court of Appeals.

      To succeed on a claim of ineffective assistance of counsel under *Strickland v.*

*Washington*, 466 U.S. 668, 686 (1984), a petitioner has to show that his lawyer's conduct "so

undermined the proper functioning of the adversarial process" that the process "cannot be relied

on as having produced a just result." Specifically, a petitioner must show that "(1) his counsel's

performance fell below an objective standard of reasonableness under prevailing professional

norms and (2) he was prejudiced by counsel's deficient performance." *Id.* The *Strickland*

standard applies to claims of ineffective assistance of appellate counsel on a defendant's first

appeal as of right, as well.  *Aparicio v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001) (citing *Evitts v.*

*Lucey*, 469 U.S. 387, 396-97 (1985)). The issue of prejudice need not be addressed, however, if a

petitioner is unable to demonstrate first that his counsel's performance was inadequate. "[T]here

is no reason for a court deciding an ineffective assistance claim to . . . address both components

of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at

697.

### 1.      Failure to challenge the legal sufficiency of the evidence

      The standard for overturning a verdict for legally insufficient evidence is the same in

New York and in the Federal courts. Only if, after viewing the evidence in the light most

favorable to the prosecution, no rational trier of fact could have found the essential elements of

the crime to be proved beyond a reasonable doubt, can the verdict be said to be legally insufficient to comport with the requirements of due process. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *accord People v. Bleakley*, 69 N.Y.2d 490, 495 (N.Y.1987) ( "For a court to conclude . that a jury verdict is supported by sufficient evidence, the court must determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence. . .") "A sufficiency inquiry requires a court to marshal competent facts most favorable to the People and determine whether, as a matter of law, a jury could logically conclude that the People sustained its burden of proof." *People v. Danielson*,  9 N.Y.3d 342, 349 (N.Y. 2007). "This deferential standard is employed because the courts' role on legal sufficiency review is simply to determine whether enough evidence has been presented so that the resulting verdict was lawful." *People v. Acosta*, 80 N.Y.2d 665, 672 (N.Y. 1993).

On direct review in New York, "an insufficiency argument may not be addressed unless it has been properly preserved for review during the trial.**"** *People v. Hines*, 97 N.Y.2d 56, 61 (N.Y.2001).  Where, as a here, a defendant presents evidence on a charge at his trial, he subsequently waives any argument going to the sufficiency of the evidence for purposes of appellate review. *See People v. Kirkpatrick*, 32 N.Y.2d 17, 21 (N.Y.1973) ("However, it is settled that a defendant who does not rest after the court fails to grant a motion to dismiss at the close of the People's case, proceeds with the risk that he will inadvertently supply a deficiency in the People's case.") (citing, *inter alia*, *United States v. Calderon*, 348 U.S. 160, 164 n. 1 (1984) ("By introducing evidence, the defendant waives his objections to the denial of his motion to acquit."); *accord People v. Hines*, 97 N.Y.2d at 61 ("Thus, a defendant who presents evidence

after a court has declined to grant a trial motion to dismiss made at the close of the People's case waives subsequent review of that determination."). This is what occurred in here. Mills testified in his own behalf and presented two defense witnesses, his step-father and his former girlfriend. Because Mills presented a defense, it appears that under New York law, any motions for a trial order of dismissal made by trial counsel prior to the defense case were nullified by the presentation of evidence on Mills' behalf.[8]  As there was no additional motion for a trial order of dismissal after the defense rested, any claim Mills had regarding the legal insufficiency of the evidence was not properly preserved for appellate review.

That the legal insufficiency claim was not preserved for appellate review by appropriate objection was a key consideration for appellate counsel. Without question, appellate counsel's decision as to whether to raise a particular claim is properly affected if the claim is unpreserved. Although the Appellate Division is authorized under N.Y.Crim. Proc. Law § 470.15(3) & (6) to exercise its discretion to review unpreserved claims "in the interests of justice," "New York permits review of the merits of claims not raised in the trial court only sparingly," and "interests of justice" review is not routinely performed. *Quirama*, 983 F.2d at 14 (citing *Martinez v. Harris*) (citing *People v. Robinson*). Given the clear lack of preservation, it cannot be said that appellate counsel was unreasonable in declining to include a "legal insufficiency" claim in her appellate brief.  *See Clarke v. Goord*, No. 07-CV-0366, 2007 WL 2324965, at *6 (E.D.N.Y. Aug. 10, 2007) ("It cannot be unreasonable for appellate counsel not to raise an unpreserved issue on appeal."); *see also Aparicio v. Artuz*, 269 F.3d 78, 96 (2d Cir. 2001) (holding that appellate counsel was not ineffective for failing to raise a claim of Double Jeopardy that clearly

---

[8]        And, assuming for the sake of argument that he could have done so, Mills did not make a renewed motion for a trial order of dismissal after the defense rested.

had been waived at the trial level and therefore not preserved for appellate review). "[A]ppellate counsel's failure to argue an unpreserved issue was not an objectively unreasonable decision devoid of tactical justification." *Weathers v. Conway*, No. 05-CV-139S, 2007 WL 2344858, at *5 (W.D.N.Y. Aug. 15, 2007) (Skretny, D.J.). Where, as here, there is no basis to conclude that the appellate court would have considered the issue on the merits, it seems that Mills cannot demonstrate that the outcome of the appeal would have been different had an unpreserved issue been raised. *Accord Weathers*, 2007 WL 2344858, at *5.

### 2. Failure to argue a "weight of the evidence" claim

A challenge to the weight of the evidence in New York is grounded in the Criminal Procedure Law and requires the reviewing court to evaluate the evidence presented by both sides, including an assessment of the witnesses' credibility. N.Y. CRIM. PROC. LAW § 470.15(5); *People v. Bleakley*, 69 N.Y.2d at 495. Such a challenge presents only a state law issue and is not a ground for federal habeas review. *E.g.*, *Guity v. Ercole*, No. 07-CV-728 (RPP), 2007 WL 3284694, at *6 (S.D.N.Y. Nov. 6, 2007) (noting that challenges to the weight of the evidence are "not cognizable on habeas review" and collecting cases)). However, a claim of ineffective assistance of appellate counsel may be premised on appellate counsel's failure to raise a state-law claim on appeal. *Sellan v. Kulhman*.

Unlike a legal-insufficiency claim, a weight-of-the-evidence claim does not need to be preserved at the trial level. Thus, there was no procedural impediment to raising a weight-of-the-evidence claim in Mills' case. And, even though this was a "nonfrivolous argument," it is "not sufficient for the habeas petitioner to show merely that counsel omitted a nonfrivolous argument, for counsel does not have a duty to advance every nonfrivolous argument that could be made."

*Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000) (quoting *Mayo v. Henderson*, 13 F.3d 528,

533 (2d Cir. 1994)). Thus, the fact that Mills' appellate counsel declined to raise a nonfrivolous

argument does not, in and of itself, constitute deficient performance under the Sixth Amendment.

*See id.*

 Here, although a weight-of-the-evidence argument was not frivolous, it was not "clearly

stronger and more significant" than those issues actually presented so as to render appellate

counsel unreasonable. *Mayo v. Henderson*, 13 F.3d at 533-34 (citing *Gray v. Greer*, 800 F.2d

644, 646 (7th Cir. 1986)). And, in this Court's opinion, Mills was not prejudiced by appellate

counsel's failure to include it because it was not likely to have resulted in reversal of his

conviction on appeal, as discussed further below.

 In New York, the threshold question facing a court conducting a weight of the evidence

review is "whether an acquittal would not have been unreasonable." *People v. Danielson* (citing

*People v. Romero,* 7 N.Y.3d 633, 636 (N.Y. 2006)). The trial court in Mills' case expressed the

view, during oral argument on the defense's request to charge lesser included offenses of

manslaughter in the second degree and criminally negligent homicide, that "there was "no

reasonable view of the evidence that would warrant a charge of reckless or negligent conduct

and with respect to the justification, it's a slim call as it is . . . " However, the trial court *did*

agree to charge the jury on the justification defense, which would support a conclusion by the

appellate court that an acquittal would not have been unreasonable. Assuming, *arguendo*, that

the Appellate Division would have answered the threshold question affirmatively, that court then

was required to "weigh conflicting testimony, review any rational inferences that may be drawn

from the evidence and evaluate the strength of such conclusions" and, "[b]ased on the weight of

the *credible* evidence, . . . decide[ ] whether the jury was justified in finding the defendant guilty

beyond a reasonable doubt[.]" *Id.* (citing *People v. Crum*, 272 N.Y. 348, 6 N.E.2d 51 (N.Y.

1936) (emphasis supplied)). Thus, when conducting a weight-of-the-evidence review,

"[e]ssentially, the court sits as a thirteenth juror and decides which facts were proven at trial."

*People v. Danielson*, 9 N.Y.3d 342, 349 (citing *Tibbs v. Florida*, 457 U.S. 31, 42 (N.Y. 1982)).

The credible evidence presented to the jury was overwhelming that Mills was at the scene

of the shooting and was the gunman. For the jury to find otherwise, in this Court's opinion,

clearly would  have been against the weight of the credible evidence.

The issue of whether the prosecution disproved Mills' justification defense is the only

question about which appellate counsel could have raised a colorable weight-of-the-evidence

argument. The jury did hear conflicting testimony at Mills' trial with regard to the extent of the

prior circumstances of violent behavior by the victim and her boyfriend with respect to

petitioner, and with regard to the situation facing petitioner in the moments before the shooting.

This Court will accept, for argument's sake, the testimony offered by Mills and his step-father

concerning the prior altercations Mills had with Jaycox and the decedent and that Mills

*subjectively* believed that he was in danger of having deadly physical force used against him. In

other words, the Court will assume for the sake of argument that Mills presented credible

evidence so as to fulfill the subjective prong of the two-prong test in New York for establishing a

justification defense under N.Y. Penal Law § 35.15.[9]

---

[9]         As noted above in this Report and Recommendation, the jury at Mills' trial was instructed that
"[t]he first test is a subjective test, that is, what this defendant, not some other person, in fact, believed" and that it
"should figuratively put [itself] in the shoes of the defendant and consider how the situation appeared to him" by
"consider[ing], for example, what was said and done before and during the encounter, whether any weapon was
possessed or used by any other person, any differences in physical size or attributes among the parties, any prior
experiences of the same or similar nature experienced by the defendant, any prior knowledge this defendant had of

However, this Court does not believe that the credible evidence supported a finding that Mills' fear was objectively reasonable; in other words, the jury would have had to reject the credible evidence offered by the eyewitnesses, the physical evidence, and the medical evidence, and rely upon evidence provided by witnesses who had motives to be untruthful and who provided inconsistent testimony. Turning first to the credible evidence, the police found five shell casings were scattered diagonally across the street leading from the sidewalk that Mills was on towards the driveway of 295 Auburn, indicating that the shooter was moving while he was shooting. Stefano and Lugo said that the shooter was moving while he was firing towards his target (the decedent), who was running away from him. The decedent died as the result of a bullet wound inflicted in her upper back, in the shoulder area, by a .380-caliber semiautomatic weapon. Their testimony corroborated the testimony provided by Jaycox, the decedent's boyfriend.

Jaycox did not have a gun on the day of the shooting, or during the altercation with Mills two days before the shooting. There was no evidence that Jaycox had a gun at any other time. Mills' step-father attempted to imply that Jaycox had fought with Mills the previous year and had displayed a gun while sitting in a car. However, he readily backed off from this testimony during the cross-examination and admitted that this individual was not Jaycox, and that Jaycox had not been involved in a fight with Mills in the summer of 1998. There was no other credible evidence that, during any of Mills and Jaycox's prior altercations, Jaycox had brandished, used, or claimed to have, a firearm or other weapon. In fact, one witness, who happened to be a friend of Mills', testified that during the fight that occurred two days before the shooting, Mills was

---

the other's reputation for violence, any prior specific assaults upon the defendant or upon others, or any other prior threats made against the defendant." T.659-61.

wielding a four-by-four piece of lumber. Immediately after the incident, the police patted down Jaycox, and found no weapon.

The decedent, Okorougo, did not have a gun the day she died, or at any other time. There was thus no evidence that either the decedent or her boyfriend had ever threatened or threatened use of deadly force against Mills during their previous encounters or during the incident in which Okorougo was shoot. The credible evidence instead showed that Okorougo was verbally confrontational towards Mills immediately before the shooting. She was seen to have run down the driveway and yell, "What's up mother fucker?" or something to that effect.

Turner, the only witness that Mills offered in support of his claim that Jaycox had a gun, did not even provide unequivocal testimony to that effect. The most she could say was that she allegedly saw Jaycox's "shirt go up" and she saw "something"–but did not know what it was, and it could have been a belt buckle. Moreover, Turner was substantially and significantly impeached . She was shown to have been involved in a previous domestic dispute with Mills about which she declined to press charges. She left town for three days after the shooting because Mills called her and told her to get out of her house. There also was a death threat made to her just before trial, which came from "someone" at the Erie County Holding Center (where Mills was being housed).

There was thus a lack credible evidence to establish the objective prong of the justification defense–that a reasonable person would have believed that he or she was in danger of having deadly physical force used against him or her by Okorougo or Jaycox. The jury would have had to rely on conjecture and surprise to find, or to infer, that either the decedent or her boyfriend had a gun or were somehow about to use deadly physical force against Mills.

-51-

In contrast to the lack of evidence that either the decedent or her boyfriend were threatening the immediate use of deadly physical force, there was ample evidence that Mills had the capability and willingness to use such force. First, he owned the same type of gun used to shoot the decedent, and he had threatened to use the gun against her in retaliation for her punching him in the eye while he was fighting her boyfriend. Two friends of Mills' testified that on the day before the shooting, Mills displayed a .380-caliber semiautomatic gun to them and to the mother of one of them. When he displayed the gun to those individuals, he said that he was going "get that bitch." There was no doubt in their minds that Mills was referring to Okorougo who had embarrassed him the day before by punched him in the face and cutting his eye with her ring.

In New York, "[w]eight of the evidence review, on the other hand, requires the appellate court, viewing the evidence in a neutral light, to make its own independent determination as to the 'relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony'[.]" *People v. Carthrens*, 171 A.D.2d 387, 392 (App. Div. 1st Dept. 1991) (quoting *People v. Bleakley*, 69 N.Y.2d at 495) (further quotation omitted)). After carefully reviewing the entire trial transcript, there is no reasonable probability, in this Court's opinion, that the Appellate Division would have concluded that the jury failed to correctly weigh the evidence presented to it. Therefore, I cannot conclude that there is any reasonable probability that a weight-of-the-evidence claim would have been successful on direct appeal in Mills' case. And, accordingly, there is no basis for finding that Mills was prejudiced by appellate counsel's failure to include it in her brief. Therefore, I recommend finding that this final aspect of Mills' ineffective assistance claim be found to be without merit.

**V.**      **Conclusion**

For the foregoing reasons, I recommend dismissing the original petition (Docket No. 1) and denying the pending motion to amend and motion to stay (Docket No. 19). Because he has failed to make a substantial showing of the denial of a constitutional right, I further recommend that no certificate of appealability should issue with respect to any of Mills' claims. *See* 28 U.S.C. § 2253(c)(2).

/s/ *Victor E. Bianchini*
_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: January 22, 2009
Buffalo, New York.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3). The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to petitioner and respondent.

**IT IS SO ORDERED.**

/s/ *Victor E. Bianchini*

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: January 22, 2009
Buffalo, New York.

-54-